### RAINEY v. H. C. FRICK COKE CO.

(Circuit Court, W. D. Pennsylvania. April 7, 1896.)

PARTITION—COAL LANDS—INJUNCTION AGAINST MINING.

Complainant brought suit against defendant for the partition of certain coal lands owned by them in common, and defendant, in its answer, conceded the right to demand partition. Pending the suit, complainant ex-

tended the workings from certain mines owned by him on adjoining land, and began mining coal from the common land. Defendant then filed a cross bill to enjoin such mining, alleging that the same was causing *irreparable injury to the defendant in its part ownership. Held,* that the court had the power to enjoin such mining during the pendency of the suit, and in view of the complications which would result from it, in the adjustment of the respective interests of the parties, and the possible injury to the common property, such power should be exercised.

Sur cross bill praying for an injunction.

J. S. Ferguson, for complainant.
W. F. McCook and Knox & Reed, for defendant.

BUFFINGTON, District Judge. On March 15, 1895, W. J. Rainey, a citizen of the state of Ohio, and owner of an undivided one-third of a tract of land containing from six to seven hundred acres, situate in Fayette county, Penn., and known as the "Beeson Farm," filed a bill in equity, for partition, against the H. C. Frick Coke Company, a corporation of the state of Pennsylvania, owner of the remaining two-thirds. On May 6, 1895, the company filed its answer, conceding complainant's right to demand partition. The land is underlaid with Connelsville coking coal. Adjoining the land on the south is a tract owned by Mr. Rainey, and on which are located his Mt. Braddock mine and coke ovens. Subsequent to the filing of the bill, Mr. Rainey, without asking leave of this court, extended flat heading No. 11 of his Mt. Braddock slope across the division line, and into the Beeson land, and has since mined coal from the same, taking it to the surface through the said slope. On March 11, 1896, the company filed a cross bill praying an injunction to restrain said mining. The bill alleged Mr. Rainey had in February, 1893, begun a proceeding for partition of the same land in the court of common pleas of Fayette county, and, after much testimony taken on both sides, had discontinued the same, by leave of court; and this is alleged to have been done in bad faith; and the same day he filed the present bill. The cross bill also alleged the coal constituted the principal value of the land; that the mining of it was causing irreparable injury to the company, in its part ownership, and tended to reduce the value of the balance of the coal in the tract; that the dip of the vein was such that the water from the Mt. Braddock mine would drain into the Beeson coal; that, owing to the presence of gas in the old and abandoned portions of the Mt. Braddock mine, there would be great danger in subsequently mining the Beeson coal from an opening made on that farm, unless protecting pillars of an otherwise needlessly large size, and of an irregular contour, to correspond to the operations of Mr. Rainey, were left as a protection against water and gas. It also alleged Mr. Rainey's plan of mining was made with sole reference to taking out the coal through the Mt. Braddock slope, and was inconsistent with a plan for taking it out through an opening made on the Beeson farm. The answer of Mr. Rainey denies bad faith in the former partition; asserts his right as a tenant in common to mine the coal; denies his operations will flood the Beeson coal, or endanger subsequent mining

thereof, through water or gas; and avers his operations are conducted on a proper plan, and in the usual method.

The issues formed bring us face to face with the question whether a court of equity which has assumed jurisdiction to partition land, the substantial value of which is in unopened coal, has power, pending its partition, to preserve the property by enjoining one tenant in common, on complaint of his fellow, from mining the coal through an entry from an adjoining tract owned by the latter. The right of the tenant to so mine, and the consequent lack of power in the court to prevent it, are broadly asserted in this case, and the question thus presented is of a novel and important character. In the absence of prior adjudications, its solution would seem clear, in the light of certain fundamental legal and equitable principles. When Mr. Rainey invoked the jurisdiction of this court by his bill, he stated:

"That the enjoyment of said tract of land by your orator and his cotenant, the defendant, is subject to great inconveniences and difficulties, and that they have been unable to procure a partition thereof between themselves, according to their respective rights and interests, whereupon your orator needs equitable relief, and prays * * * that your honors decree that partition be made of the above-described real estate between your orator and the defendants, according to their respective rights and interests."

To the right of Mr. Rainey to demand partition the company has assented by its answer, with the added averment that, the principal value of the land being its coal, "partition thereof, in proportion to the interests of the plaintiff and defendants, cannot be made without prejudice to or spoiling the whole," and praying "that said property be disposed of otherwise, as a whole, according to law." In addition to the court's jurisdiction of their persons, all parties have, by their voluntary acts, brought the land itself within the control or jurisdiction of the court, for valuation, partition, allotment, or sale, as the proofs and law may hereafter seem to warrant. The proceeding, then, is in the nature of one in rem, in that the court is asked to make a decree directed against, and acting upon, the land itself. Where a court of equity has rightfully assumed jurisdiction of a principal subject-matter, it has power to dispose of all questions incidental to and arising out of the principal subject of jurisdiction, and necessary to its proper settlement and disposition. See Winton's Appeal, 97 Pa. St. 395; Allison's Appeal, 77 Pa. St. 227; McGowin v. Remington, 12 Pa. St. 63; Souder's Appeal, 57 Pa. St. 498; Kocher's Appeal, 104 Pa. St. 615. And, in proceedings in partition, its scope is not narrowly restricted; "for," as was said in 1 Story, Eq. Jur. § 656b, "in all cases of partition a court of equity does not act merely in a ministerial character, and in obedience to the call of the parties who have a right to partition, but it founds itself upon its general jurisdiction as a court of equity, and administers its relief ex aequo et bono, according to its own notions of general justice and equity between the parties." Moreover, it is clear that a court of equity has the power, and in a proper case will restrain the exercise of a legal right, where it is improperly or inequitably used. Rog. Mines, 795; Buckland v. Gibbins (1863) 32 Law

J. Ch. 391. Assuming the legal right of Mr. Rainey, as a co-tenant, to mine the coal up to that time, when the court assumed jurisdiction to partition the land the prior legal rights of the parties to the suit to consume or diminish it by mining became subject to the equitable control of the chancellor. If the subject-matter of partition is consumed, obviously no partition of it can be made. It would therefore seem that, as between the parties to the suit, power in the court to preserve is a necessary incident to jurisdiction to partition. In Hawley v. Clowes, 2 Johns. Ch. 122, which was a bill to partition land, and for an injunction to restrain a tenant in common from cutting timber, Chancellor Kent granted the injunction, saying, "This remedy is peculiarly proper and appropriate pending a bill for partition of the very land." In Obert v. Obert, 5 N. J. Eq. 397, while it was held the facts did not justify the application of Hawley v. Clowes, yet Chancellor Halstid expressed his approval of it, and said the principle of Chancellor Kent in that case was a safe one. It would thus seem that this court has the power to enjoin, if the application in hand commends itself to the sound discretion of the chancellor. Upon that point we have no question. There are serious and well-founded objections to allowing the mining of this coal pending the partition. The mining thereof until final decree would result in an anomalous situation, and involve the proceedings in confusion and serious embarrassment. What period would be chosen as the one at which to estimate the value of the land? Would it be the tract as it was when the bill was filed, or as it is when the witness testifies, or as might be when this decree is to be made? If either of the first two is chosen, the testimony would not be applicable to the situation when the decree was made; and, if the last, the evidence would be wholly problematic and speculative. Indeed, in any aspect, if mining were allowed the court would be confronted by a shifting state of facts and values, which, in its confused and confusing nature, could afford no stable ground on which to base an intelligent, equitable, and just decree. If the tenant of the one-third cannot be restrained, the tenant of the two-thirds should not; and, if both mined, the confusion of facts and proofs would be such that no court could practically and intelligently value, allot, or partition the land. To say the powers of a court of equity are so plenary and plastic that from these intricacies it could work out the equities of both parties, and mold a decree to suit the requirements, is to beg the question. The prompt use of its plenary powers to prevent these mischiefs at the outset of the case, rather than to cure them at the close, is a course which better commends itself to the sound discretion of a court of chancery. By preserving the status in quo,—one of the most beneficial branches of equity jurisdiction,—we avoid confusion and all danger of injustice, and insure a speedy, plain, and practical method of arriving at a proper decree. These considerations alone are sufficient to move a chancellor, in the exercise of a sound discretion, to preserve the present status of the land. But there are other facts which strengthen him in that conclusion. The proposed mining is not through a shaft or slope upon the premises themselves, nor through one which will inure to the benefit of the

subsequent owner of the land. The coal at that part of the land is thus made servient to an opening on an adjoining tract; the plan of mining is based on operations through the land of another; and even entry to or inspection of the coal is, so far as the objecting tenant is concerned, at the will or license of the owner of the dominant adjoiner. As we have seen, the respondent company asserts the tract cannot be justly partitioned, but should be disposed of as a whole. Upon that question we express no opinion, but, if such be the case, it is obvious that the mining of the coal during the pendency of the bill may seriously impair the rights of the parties; for it is obvious to those conversant with the coal business that the successful and profitable mining of large blocks of coal requires a comprehensive and consistent plan of proposed operations. Hence plans that might be feasible and economical, and which would render the whole tract of great value, might have to give way to relatively more expensive ones, if only a third, a half, or two-thirds of the tract could be had. It is obvious, too, that a plan which would distribute the cost of general items of expense, such as shaft, pumps, ovens, and other necessary appliances, over a large block of coal, would render that acreage relatively more valuable than when applied to a much smaller quantity. Whatever may be the facts in this particular case, and whatever the proofs may hereafter disclose, certainly the court should see to so preserving the status of the land that, if the justice of the case requires such a decree, the suitor shall not be deprived of his right to it, and its enforcement. As regards the method of mining here sought to be enjoined, we have conflicting statements from equally experienced men that grave damages from gas and water will—and from others, equally experienced, that they will not—result to the Beeson coal. We will not attempt to pass on these differences. Whether these apprehensions are well or ill founded, it is sufficient to say the subtile character of the subterranean elements in question are always, in mining operations, elements of more or less uncertainty and possible danger, and we avoid all risk of doing harm to the land we have undertaken to partition by staying the hand of all parties until we have finished our duty in the premises. The temporary suspension of the co-tenant's right to mine in this case works no hardship, since it has been for months past, and is now, in his power to speed the proceeding to final decree. This he can do in much less time than he could do if mining were allowed, and caused confusion and consequent delay in procuring a final adjustment. In the exercise of what we believe to be a sound discretion, in furtherance of the orderly conduct of the cause, and with a view to an intelligent and prompt disposition of the same, we are of opinion an injunction should issue as prayed for, and it is so ordered.